STATE v. TABASSO HOMES, INC., et al.

(*September* 9, 1942.)

RODNEY and SPEAKMAN, J. J., sitting.

*James R. Morford,* Attorney-General, for the State.

*Victor J. Colombo* and *A. James Gallo* for the defendants.

Court of General Sessions for New Castle County, No. 76, May Term, 1942.

RODNEY, J., delivering the opinion of the Court:

██ Reasons 1 and 2, attacking the statute by reason of the insufficiency of the title, will be disregarded. No argument was addressed to these points and they are not mentioned in the brief of the defendant, and no defect of the title is pointed out or relied upon.

3. The objection that the statute is violative of the due process clauses of the Federal and State Constitutions Amend. 14 and Art. 1, § 9, requires more elaborate consideration. The assigned objection is that "the statute interferes with a civil contract and imposes a criminal penalty for a violation of such contract."

██ Of course we appreciate the fact that the right to contract is one of the great, inalienable rights accorded to every free citizen. We appreciate the fact as expressed by Sir George Jessel in *Printing Co. v. Sampson*, L. R., 19 Eq. 465,

"If there is one thing more than another which public policy requires it is that men of full age and competent un-

derstanding shall have the utmost liberty of contracting" and that this freedom of contract shall not lightly be interfered with.

We also recognize that freedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist.

Any premise, however, looking toward the view that no statute can interfere with or impinge upon the free and unlimited right to contract must be taken with limitation. A statute will never be condemned unless its invalidity is clear. A Court is not concerned with the wisdom, policy or expediency of a law, and when an act is challenged the inquiry should be not whether it can be condemned, but whether it can be upheld. The principles of public policy are largely in the keeping of the Legislature, and when it is apparent that an evil exists from which the public should be protected, the people, acting through the Legislature, have power to eliminate the evil. The question then is concerned with the reasonableness of the regulation for it is an established rule that "a state may not, under the guise of protecting the public, arbitrarily interfere with private business or promote lawful occupations or impose unreasonable and unnecessary restrictions upon them." *Jay Burns Baking Co. v. Bryan,* 264 U. S. 504, 44 S. Ct. 412, 413, 68 L. Ed. 813, 32 A. L. R. 661. Where the restriction is reasonable or there is any basis for the classification or subject of the legislative will, the Act for public protection will be supported.

The Act in question may well be considered as a sort of corollary or supplement to the Mechanics Lien Law, Rev. Code 1935, § 3324 *et seq.* Under that law an owner may enter into an agreement with a contractor for the erection of a building, and persons furnishing labor or material to the contractor, even without the knowledge of the owner, may, under the theory of agency of the contractor for the

owner, obtain liens against the property of the owner. If these liens are not paid the owner may under the Act retain and withhold from the contractor such sums as may be necessary to pay the claims, notwithstanding the terms of any pre-existing contract between them. The present Act does little more with reference to the limitation of the right to contract. It simply says that money paid to a contractor to be used in a building operation shall constitute a trust fund for those who by labor or materials have erected the building, and punishes the violation of the Act. To us it seems that when liens may be filed against an owner by persons working on or furnishing materials for a building merely by virtue of agreement with the contractor, and not directly with the owner, that in such case money paid by an owner to a contractor on account of that building operation raises an implied agreement that such money shall be applied on account of services or materials to the building itself, and the prevention of liens against the building. It is this moral obligation, this tacit understanding or implied agreement that is made certain by the statute and able to be enforced.

A plain distinction exists between the theory and nature of the Mechanics Lien Statutes of the various States. These laws are usually divided into two classes generally called the "New York" or "Pennsylvania" Systems. Under the New York System the lien of a sub-contractor or materialman depends upon or is limited by the amount remaining due to the contractor. Under these statutes the sub-contractor, laborer or materialman has only a derivative lien, being substituted to the right of the contractor. Under the Pennsylvania System the right of sub-contractors, laborers or materialmen does not depend at all upon any indebtedness due from the owner to the contractor, but they get a direct lien as distinguished from a derivative one. Delaware follows the Pennsylvania System. The distinction is a fundamental one in the present case and with the distinc-

tion firmly in mind the purposes and effect of the statute under construction become clear. When an owner of land enters into a contract for the erection of a building it is understood that such contractors must arrange, either for sub-contractors or for labor and material. There springs into existence an implied agency of the contractor for the owner to obtain the necessities for the building, and upon this theory of agency rests the right of sub-contractor, laborer or materialmen to obtain direct liens upon the property of the owner. It has been said that these liens by persons having no direct contractual relation with the owner are somewhat akin to an attachment or garnishment of the fund in the owner's hands with the property as security. 36 *Am. Jur.* 21.

It is this fact of agency of the contractor for the owner that furnishes much of the purpose and reason of the present statute. When an owner contracts for the erection of a building all sub-contractors, laborers or materialmen engaged in such building operation can, as we have seen, obtain direct liens against the property. For the prevention of these liens all funds paid to the contractor on account of the erection of the building may be said to constitute trust funds for the payment of claims that could materialize into liens. The statute has for its object both the protection of the owner whose property, by reason of the implied agency of the contractor, may be made liable for sub-contracts, labor or material furnished for the building, and to give additional protection to the sub-contractors, laborers or materialmen engaged upon the building.

With the foregoing distinction as to the nature of Mechanics Lien law in mind some order may be made of the seemingly conflicting opinions construing statutes similar to that under present discussion.

In the following States statutes somewhat analogous to our own have been sustained. South Carolina (*State v.*

*Hertzog,* 92 S. C. 14, 75 S. E. 374) ; Minn. (*State v. Harris,* 134 *Minn.* 35, 158 N. W. 829) ; Wisconsin (*Pauly v. Keebler,* 175 *Wis.* 428, 185 N. W. 554) ; Washington (*State v. Williams,* 133 *Wash.* 121, 233 P. 285). · In this case last cited, the distinction herein made was relied upon, but the Court inadvertently transposed the New York and Pennsylvania Systems of Mechanics Liens.

In that case the Court in distinguishing *People v. Holder,* 53 *Cal. App.* 45, 199 P. 832, stated that under the California law the lien of sub-contractors and materialmen was derivative and not a direct lien. From an incomplete examination we are not entirely certain that such statement was correct, but feel that the distinction between the two types of Mechanics Lien law was a valid one, even though the application of such distinction in a particular case should fail of its object.

In California it has been held that statutes somewhat analogous to our own were unconstitutional. In *People v. Holder,* 53 *Cal. App.* 45, 199 P. 832, it was held that two statutes operating as amendments to a general embezzlement statute were invalid, as destroying the right to enter into a contract, and as attempting to require a contractor to make specified application of money paid in performance of the contract, which money was held to be solely that of the contractor. This was followed in South Dakota by *Commercial National Bank v. Smith,* 60 S. D. 376, 244 N. W. 521, which State has adopted both the statute and construction from California.

If the distinction as to the California cases pointed out in *State v. Williams, supra,* is correct, then such cases are plainly distinguishable from our own. If not, then the basis seems to be the objection that the constitutional right to enter into a contract has been violated. We have already considered that point. While there is, subject to limitations, an inalienable right of parties to contract one with another,

there is no inalienable right to embezzle or misappropriate money paid pursuant to a contract for the erection of a building, and it is this latter act that the statute attempts to prevent. The statute does not interfere with the right to contract, but contractors enter into their engagements with a knowledge of the statute, in the same manner as they do with reference to the Mechanics Lien Statute, and numerous other statutory provisions.

It is also objected that the statute makes a violation thereof a criminal offense, and it is contended that thus a criminal offense is made the result of a violation of a civil contract. It will be readily seen that the penalty of the statute is not invoked by any reason of the contract, but only in case of the misapplication of money, subsequently committed by one of the contractors. The penalty of the statute only arises if and when the offense is committed. But it is objected that the statute purports to create a criminal offense without expressly prescribing that the act prohibited must be committed with criminal intent.

A crime usually is composed of two elements, an act and an intent. At common law where a specific intent was an element of the crime (and this was at times determined by the definition of the crime itself) then the specific intent was required to be alleged and proved. Where such specific intent was not peculiarly an element of the offense the intent required by the law was, at times, furnished by a consideration of the commission of the act itself, or of the means employed, for everyone is presumed to intend the natural consequence of his act.

With reference to statutory crimes, the question of intent is one largely for the legislative will, and the function of the Court is to determine the intention of the Legislature and to enforce the law in conformity with that intention. The legislative power of the General Assembly covers every subject of legitimate legislation except as limit-

ed by constitutional provisions, and the Legislature generally has power to say what shall be permitted or forbidden. As to statutory offenses, a specific intent may, but need not be, made a portion of the act itself. The violation of the statute may itself constitute the offense and furnish the intent. 16 C. J. 76, 22 C. J. S., Criminal Law, § 30; 14 Am. Jur. 784; State v. Huber, 4 Boyce (27 Del.) 259, 88 A. 453; State v. Ford, 3 Boyce (26 Del.) 469, 84 A. 1039.

Many States, indeed, make this especially true where offense is solely prohibited by the act itself being mala prohibita and not mala in se.

We have indicated that we thought the statute was to prevent the misapplication, on the part of contractors or other specified persons, of money received on account of the construction of a building, and received under circumstances constituting such fund a trust fund. We must now see whether the facts alleged in the indictment bring the transaction within the terms of the statute.

In the indictment it is set out that the defendant, itself, was the owner of land, and on Nov. 16, 1940, agreed with Warrington to build a house on this land and when completed to sell the land, with the completed buildings, to Warrington for $9850. It is alleged that between November 16, 1940, and June 20, 1941, Warrington paid the defendant $1000 on account of the purchase price, and that on March 28, 1941, the defendant, then the holder of the legal title to the land, obtained from Industrial Trust Company, the sum of $4924.55 for the erection of the building. While not expressly alleged it was tacitly understood that this latter sum was obtained by the defendant, as record owner of the land, by means of a mortgage. If we are incorrect in our assumption that the money received from Industrial Trust Company was a loan to the owner, then said fund has no shown connection with the transaction. It will be readily seen that the two funds received by the defendant were entirely dis-

tinct and of different natures. One was an amount advanced by an executory vendee to the vendor on account of a complete purchase price for land and buildings, and the other was an amount paid by a mortgagee to a mortgagor owning the land. We shall consider them in the indicated order.

(a) We will first consider the $1000 paid by the Warringtons. The defendant, Tabasso Homes, owning the land, agreed to erect a house thereon and to sell the lot and house for a unit price of $9850. No specific amount represents the cost of the lot or the value of the buildings. The consideration is entire and the usual rule is that if the consideration be entire and cannot be made severable, the contract must be held to be entire, though the subject of the contract may consist of several distinct and wholly independent items. *Lucesco Oil Co. v. Brewer*, 66 Pa. 351.

The statute, as we have seen, covers money coming into the hands of an "architect, engineer, contractor or sub-contractor." No term of the statute is appropriate to the defendant unless it be that of "contractor." Such contractor, under the statute, must receive money as contractor for the building operation. The term as used in the statute, we think, means one who enters into a contract, directly or indirectly with the owner of real estate for the construction, alteration or repair of a building thereon. The Warringtons were not the owners of the land, but had merely an agreement to purchase, which might or might not be consummated. The defendant was the owner, and, so far as disclosed, has always continued so to be.

This point becomes important and material when we consider the rights of persons furnishing labor or materials to Tabasso Homes, in and about the structure. Would they be original or sub-contractors? The time, under the Mechanics Lien Statute of Delaware, for the filing of their liens, would be different, depending upon their status. There is ample opportunity for them to acquire knowledge of the

owner of the legal title, and to contract with him. There is no opportunity to ascertain the facts as to an executory vendee under an unrecorded contract of sale.

Precisely the same state of facts as here involved was presented in *Hannan v. Handy*, 104 *Conn*. 653, 134 A. 71, 47 A. L. R. 259. There, under an almost identical situation as the present, the vendor under contract to erect a building and convey the completed structure, together with the lot, was held not to be a contractor, so that those working on the building or furnishing materials therefor, by contract with the vendor, did so with him as owner and not as a contractor. See, also, *Evans-Lee Co. v. Knudtson*, 190 *Wis*. 207, 208 N. W. 872.

Of course, we do not say that the executory vendee having possession of land but, as yet, no title thereto, may not enter into a building contract binding on him when title passes, or that such contract may not be made by the vendee with the vendor's consent, express or implied.

We likewise would not be understood to say that an executory vendee of a lot may not enter into a contract whereby the vendor might also erect a building, as contractor for the vendee. This was the situation in *Fullmer v. Poust*, 155 *Pa*. 275, 26 A. 543, 35 *Am. St. Rep.* 881. There the contract was sustained because the sale of the lot and the erection of the building were severable and distinct matters, and did not constitute one entire contract. No such facts appear in the present case.

 Tabasso Homes, insofar as the Warringtons were concerned, was a "contractor" in the limited sense that a contract of a nature existed between them. It was not a "contractor" in the sense that such word was used in the instant statute. There the word clearly has the meaning that it bears in the Mechanics Lien Statute, viz., one who contracts for the erection, alteration or repair of a building. The contract between the Warringtons and the defendant

was not solely a contract for the erection of a house, but an agreement to buy a designated lot of land which should contain a house thereon, built according to agreed plans, and for an integral and indivisible price for lot and building.

We think that under the disclosed facts Tabasso Homes must be considered as owner, and not as a contractor, and that no language of a cited statute is applicable. Being a criminal law, the Court will not invade the province of the Legislature and determine that certain acts were criminal, where it is not reasonably certain that the Legislature so intended them.

(b) We must now consider the amount received by the defendant as owner of the land, being the proceeds of the mortgage given to Industrial Trust Company. It seems impossible to see how the statute could be construed to cover the amount received by the owner of the land in return for a mortgage executed by it. The only relevant portion of the statute applies to money received by a "contractor" for the building purposes. Surely this must mean money received by a contractor from some person having some privity with the contract by which the building is to be erected. The only contract alleged is between the defendant and Warrington, and with this contract there is no shown connection of Industrial Trust Company.

We have heretofore expressed the view that Tabasso Homes entered upon the erection of the buildings in question as the owner of the land. It is impossible for us to view Tabasso Homes as a "Contractor" with reference to the mortgage, or that the money received from the mortgagee was received in any manner other than as owner, or that any relationship other than mortgagor-mortgagee existed as to the proceeds of the mortgage.

We are of the opinion that the statute in question

is a valid exercise of the police power of the State, and applicable when appropriate facts exist.

We are also of the opinion that the facts set out in the indictment do not constitute an offense, and the indictment must be quashed.

We fully appreciate the nature and extent of the losses involved in this and companion cases. We cannot, however, extend the statute beyond what we think is its obvious import, and make it applicable to cases for which it was never intended by the Legislature. Indeed, if the statute had been so intended by the Legislature, it might then have been subject to serious constitutional questions not herein necessary to be considered by us.

In view of our conclusion, it has not been found necessary to consider the remaining reasons set out in the motion to quash, but many of these reasons would be more appropriate in a motion for more particularity rather than a motion to quash.