THOMPSON *v.* BOX.*

(In Banc. May 9, 1927.)

[112 So. 597. No. 26384.]

1. CONSTITUTIONAL LAW. *Court should, if possible, uphold statute by placing reasonable construction thereon, rendering it harmonious with federal and state Constitutions.*

Supreme court, in construing a statute, must, if possible, uphold statute by placing a reasonable construction thereon which would render it harmonious with both federal and state Constitutions.

2. MASTER AND SERVANT. *Person contracting with laborers, believing they had abandoned original contract, held not liable for statutory penalty (Laws 1924, chapter 160).*

Person contracting with negro laborers, believing in good faith that they had abandoned contract and premises of their former employer, did not render himself liable to penalty imposed by Laws 1924, chapter 160, in case of willfully interfering with, enticing away, or knowingly employing, laborer or renter who had contracted with another person to leave employer or leased premises.

(1)

3. MASTER AND SERVANT. *Law forbidding interference with employ-* ' *ment must be strictly construed in favor of liberty of contract and p rson* (*Laws*, 1924, *chapter* 160).

    Laws ' 24, chapter 160, forbidding interference with, or employme   of, laborer or renter contracting with another person, being extremely drastic, must be construed strictly in favor of liberty of action, liberty of contract, and liberty of person.

4. MASTER AND SERVANT. *Statements and actions of negro laborers held to have constituted abandonment of former contract authorizing re-employment by another* (*Laws* 1924, *chapter* 160).

    Statements and action of negro laborers relative to leaving former employment, together with their refusal to return for statements of account, *held* to constitute such abandonment of former contract as authorized their re-employment by any other person without creating liability for statutory penalty under Laws 1924, chapter 160.

SMITH, C. J., dissenting.

*Corpus Juris-Cyc References: Constitutional Law, 12CJ, p. 787, n. 96; p. 788, n. 99; Master and Servant, 39CJ, p. 1372, n. 49 New, 51; p. 1373, n. 63. On liability of third person for inducing a servant to break his contract, see annotation in 21 L. R. A. 238; 5 L. R. A. (N. S.) 1091; L. R. A. 1915F, 1076. On right to hire one who violates no contract in leaving another's employment, see annotation in 7 A. L. R. 305. 15 R. C. L. 44; 3 R. C. L. Supp. 416.

APPEAL from circuit court of Humphreys county.
HON. S. F. DAVIS, Judge.
Action by W. M. Thompson against C. B. Box. Judgment for defendant, and plaintiff appeals. Affirmed.

*Montgomery & Montgomery,* for appellant.

I.   The decision of this case involves a construction of chapter 160, Laws of 1924. This statute provides for four separate activities that are condemned by its provisions: (1) wilful interference, (2) enticing away, (3) knowingly employing, and (4) inducing in any manner to leave the leased premises. The declaration in the case at bar covers all four of these activities and if the existence of any one of the four has been reasonably estab-

lished by the testimony, then plaintiff below was entitled to have his case go to the jury for its determination.

We are of the opinion that the testimony does establish the liability of the defendant and does show a violation of the statute, because it shows without dispute and admittedly an open case of enticing, interferring with, knowingly employing, and inducing to leave the leased premises. Compare *Gregory* v. *State,* 42 So. 168; *Armistead* v. *Chatters,* 71 Miss. 509, 15 So. 39. The latter cases, to our minds, covers the case at bar like a blanket. The facts are almost identical.

II. The second ground of defendant's motion to exclude is that "The proof shows that the alleged tenants, Holsteen and Barton, had abandoned their contract with plaintiff and had actually left the plantation premises of the plaintiff with the acknowledged purpose not to return during the period of their contract with plaintiff and the statute does not make the defendant liable in such cases." This ground is not supported by the testimony.

When the statute says "leave his employer or the leased premises," the statute uses the word *leave* in the sense of *abandon.* Let us look to the law of abandonment and see the requirements thereof. 1 C. J., page 6, paragraph 7; *Utt* v. *Frey,* 106 Cal. 392, 397, 39 Pac. 807; *Mitchell* v. *Garden,* 21 W. Va. 277 at 285; 1 R. C. L., page 4, paragraph 5; 1 R. C. L., page 1, paragraph 1; *Young* v. *Berman,* 96 Ark. 78, 131 S. W. 62, 34 L. R. A. (N. S.).

In the light of the above authorities we cannot see how it can be said that the darkies in the case at bar had left, forsaken, or abandoned the leased premises, when the undisputed proof shows that they were in possession of the premises, occupying the houses, their families actually eating, sleeping and residing in the houses, and they themselves going back there at night to their families.

We will concede that it is no violation of the statute merely to rent land, without knowledge of the former contract. The statute is directed against wrong and if the defendant did not know of the contract at the time and did not knowingly do anything to interfere with the laborer or renter or interfere between him and his landlord, then of course there would be no wrong on his part that could be the basis of punishing him, and any punishment inflicted would be punishment for exercising his right to contract. Such is the principle laid down in *Sneed* v. *Gillman,* 44 So. 830. But if the defendant has knowingly contracted or induced or otherwise interfered, then there is a wrong that is punishable under the statute and the statute applies.

The proof does not show "that the defendant only rented land," but it shows that he is guilty of every activity that is denounced and condemned by the statute.

IV.    Counsel contends that where a tenant has breached his contract and left the leased premises another landlord can knowingly employ him without liability. In short, he asserts that the "knowingly employ" provision of the statute is not a valid provision. In our judgment, the provision is unquestionably constitutional and had already been so held in *Hoole* v. *Dorroh,* 75 Miss. 257, 22 So. 829.

*To sum up*: There must have been a valid and subsisting contract between the laborer and the first employer. Otherwise, the employer would have had no property right in the services of his servant. Such is the holding in *State* v. *Richardson,* 86 Miss. 439, 38 So. 497.

In the next place, of course, the servant must have actually entered upon the performance of the service. Such is the holding in *Hendricks* v. *State,* 79 Miss. 368, 30 So. 708; *Alford* v. *Pegues,* 92 Miss. 558, 46 So. 76; *Evans* v. *State,* 121 Miss. 252, 83 So. 167; and similar cases.

In the next place, there must have been no breach of the contract on the part of the employer, for if there has

been such a breach, then the laborer is entitled to leave the services of the employer; and he no longer is entitled to the services of the laborer for he has forfeited his right to this service by the breach of the contract. Such is the holding in *Mahoney* v. *McNeil*, 77 Miss. 406, 27 So. 528; *Petty* v. *Leggett*, 38 So. 549 (not officially reported); and *Beale* v. *Yazoo Yarn Mill*, 126 Miss. 807, 88 So. 411.

But when the breach of the first contract has been on the part of the laborer, this does not excuse him from the performance of his contract and he is still under a duty to perform. When he explains and represents to his second employer that he, the laborer, has breached the contract, then he does not relate any facts to the second employer that would excuse and release him from performance to his first employer. If the second employer employs, upon such representations, no matter how much he relies thereon, then *he does knowingly employ*. This distinction was recognized in *Armistead* v. *Chatters, supra,* and was pointed out in the *Beale case, supra.* So a reliance in such cases, on the part of the second employer, does not in any way exonerate him from liability.

If the tenant abandons his contract and leaves the leased premises and after so breaching his contract and surrendering up possession he then goes to another and is employed by him, with knowledge of the first contract, there is then liability upon the second employer for his act in so knowingly employing said laborer. *Hoole* v. *Dorroh, supra.*

*Barbour & Henry* and *C. M. Murphy,* for appellee.

Counsel for appellee argue that *Armistead* v. *Chatters,* 71 Miss. 509, and *Hoole* v. *Dorroh,* 75 Miss. 257, are conclusive here. We do not argue that either of these cases will have to be overruled. However, there has been a gradual and at last, in our judgment, a definite departure from the holding in these two cases. This is evidenced

by a brief consideration of state and federal decisions since that time. See *Jackson* v. *State,* 16 So.: 299, holding that the mere hiring after the tenant had left the premises was not a violation of the statute; *Sneed* v. *Gilman,* 44 So. 830, holding that the mere renting of land (and this is all that appellee Box did) to a tenant under contract to rent other land, even while he was occupying the land first rented, did not impose liability as the statute must be strictly construed; and so construed, it did not prohibit the renting of land from two parties. *Hendrix* v. *State,* 79 Miss. 368, held the statute forbidding the laborer or share-cropper, who was under contract, to leave the employer or the leased premises without giving notice of the first contract, was not violated in a case where the tenant had not actually gone on the premises. That statute of course has been declared unconstitutional, and the case is cited only to show the strictness of construction employed. See, also, *Alford* v. *Pegues,* 92 Miss. 558; *Evans* v. *State,* 121 Miss. 252, and *Shilling* v. *State,* 109 So. 737, are conclusive here.

In *Beale* v. *Yazoo Yarn Mill,* 125 Miss. 807, the court makes clear its purpose to follow the rule that where there are two reasonable constructions to be placed upon a statute, one of which would endanger its constitutionality, the court will adopt that construction which will save the statute from the constitutional objection. Since the cases of *Armistead* v. *Chatters* and *Hoole* v. *Dorroh,* were decided, not only the cases decided by this court and already mentioned, but the case of *Bailey* v. *Alabama,* 219 U. S. 219, has been decided and is conclusive here.

The question is too serious to admit of doubtful construction, and the statute when construed strictly, as it and all criminal statutes are required to be construed, may serve a useful purpose. However, when construed as it is sought by appellant to have it construed in this case, it cannot stand and cannot serve a useful purpose, which a proper construction enables it to do.

McGOWEN, J., delivered the opinion of the court.

Thompson, the appellant, sued Box, the appellee, for damages arising under the provisions of chapter 160, Laws of Mississippi of 1924, alleging that Box willfully interfered with, enticed away, knowingly employed, and contracted with laborers who were already under contract with Thompson, and induced said laborers to leave Thompson's premises before the expiration of the lease contracts. On conclusion of the plaintiff's testimony, the defendant moved the court to exclude plaintiff's evidence, and direct a verdict for the defendant. This motion was sustained by the court, and judgment was accordingly entered for the defendant. To this action of the court the plaintiff excepted, and prosecuted this appeal here.

A resume of the facts necessary to a decision of this case is about as follows:

Thompson was operating Sleepy Hollow Plantation in Humphreys county, Miss., for the year 1926. In December, 1925, Thompson contracted with Barton, a negro, to rent him twenty acres of land, at a rental of fifteen dollars per acre. Likewise, also, in the same month, Thompson contracted with Bailey Holsteen, also a negro, to rent him forty acres of land for the year 1926 at fifteen dollars per acre. The negroes moved on the place and began preparation of the land for the production of a crop during the year 1926. Both, likewise, received substantial advances from Thompson, and both tenants had moved on the leased premises, and had remained there from December, 1925, until February 28, 1926. On that date, the men left Thompson's place, leaving their families in the houses they had theretofore occupied on the rented lands.

Mr. C. B. Box, the defendant, offered as a witness by the plaintiff, testified that he discovered the negroes sitting in front of his commissary late in the afternoon, where he had a conversation with them to this effect: They told him they were looking for a home, that they

had contracted with Thompson and owed him, and undertook to give the amounts; that they did not intend to return to Thompson's place as his tenants; whereupon, Box told the negroes that he was in need of tenants or laborers to work his place, that he had lots of vacant houses, and further told them to go back to the place and see their employer, and bring him statements from Thompson as to the amount of the accounts, and that he (C. B. Box) would pay same. To this they responded: "We are not going back down there. We are afraid to go back down there. You will have to send some one to get those statements. We are afraid to go back, and unless we can arrange with you to intercede for us, we are not going back." They gave to C. B. Box as a reason for their dissatisfaction that they were unwilling to work under any submanager; that they made the agreement to work under W. M. Thompson, and that this brother of W. M. Thompson's was "too rapid;" that W. M. Thompson put this younger man over them, and that they understood he had whipped one or two of them, and had made a remark that after "draw day" he would "crack down them;" that after they got "their limits" he was "going to do some cracking down on them;" and that they were afraid of him and that was why they left the place.

Mr. C. B. Box said he assumed that, if he paid these negroes' accounts, they would move on his place, and, on Monday morning, he sent his brother, Rufus Box, his plantation manager, with a check signed in blank, down to Thompson's place, telling his brother to go down there and see Thompson and see if he was agreeable to the payment of these accounts and moving them. Defendant also testified that he had to be away from home, and that was the reason he sent his brother with the instructed details, that defendant was away for a few days, and that when he returned he was informed by his brother that he had not been able to move the darkies; that Mr. Thompson refused to consent to their moving. The

defendant also testified that he told his brother to let the negroes alone. The negroes then went before a justice of the peace who had subleased the plaintiff's place from Box, and made affidavit in replevin for their household goods and effects. The writ was issued and placed in the hands of the sheriff of the county, who telephoned C. B. Box and told him that he had a writ of replevin for the household goods of the two negroes, and asked Box to let him have wagons in which to bring the goods away, to which he agreed and became surety on the replevin bonds. The sheriff then executed the papers and moved the household goods to Box's place where the two negroes had already installed themselves. Thereupon C. B. Box authorized his brother to contract with one of the negroes to rent him land, and the other negro to become a subtenant of the tenant. Box furnished supplies to the negroes during the year.

The plaintiff testified that Rufus Box did not offer him any check, but came to see him on Monday, and mentioned to him moving these negroes, to which the plaintiff replied that he preferred to talk to the negroes; that Rufus Box replied that he would not be permitted to talk to them. Just what prevented Thompson from interviewing the negroes does appear in this record.

The facts of this case call for a construction of chapter 160, Laws of 1924, which is as follows:

"That if any person shall willfully interfere with, entice away, or who shall knowingly employ, or who shall in any manner induce a laborer or renter who has contracted with another person for a specified time to leave his employer or the leased premises, before the expiration of this contract without the consent of the employer or landlord in writing signed by said landlord or employer under or with whom said laborer had first contracted, he shall, upon conviction, be fined not less than twenty-five dollars nor more than one hundred dollars, and in addition shall be liable to the employer or landlord for all advances made by him to said renter or laborer by

virtue of his contract with said renter or laborer, and for
all damages which he may have sustained by reason
thereof. The provisions of this section shall apply to
minors under contract made by a parent or guardian.''

The precise question presented here is whether C. B.
Box, in good faith, believed at the time he employed these
negroes that they had abandoned the contract with
Thompson and their leased premises as well.

Counsel for appellant relies upon the cases of *Gregory
v. State,* (Miss.), 42 So. 168, *Armistead* v. *Chatters,* 71
Miss. 509, 15 So. 39, and *Hoole* v. *Dorroh,* 75 Miss. 257,
22 So. 829, relying mainly upon the case of *Armistead* v.
*Chatters, supra,* wherein Judge COOPER held, as shown by
the syllabus, as follows:

''Under Code 1892, section 1068, making liable, in
double damages, any person who 'knowingly employs' a
laborer under contract with another for a specified time
before the expiration of the contract, without the em-
ployer's consent, the fact that the laborer breaks the
contract, and ceases to work thereunder, before he is
employed by such person, does not render the latter any
the less liable for damages. . . . The defendant con-
tended in the court below (1) that, if the laborers had
broken their contracts with the plaintiff before they re-
moved to the place of defendant, or were employed by
him, he was not liable, under the statute, to the plain-
tiff's action; (2) that, if liable at all, the measure of the
plaintiff's recovery would be double the damages sus-
tained by the plaintiff because of the employment by the
defendant of the laborers, and not double the damages
sustained by the plaintiff by reason of the breach of their
contract by the laborers. The defendant concedes that,
if these propositions shall be decided against him, the
damages awarded by the jury are reasonable, and the
judgment should be affirmed.

''The appellant's construction of the law cannot be
maintained. It denounces a penalty, and fixes a liability,
not only upon persons who 'interfere with, entice away

or induce a laborer or tenant to leave the service of his employer or landlord,' but also against such persons who 'knowingly employ' such laborer or tenant before the expiration of his term of service or tenancy, without the consent of his employer or landlord. The purpose of this clause of the law is to incite and constrain laborers and tenants who are under engagements for specified time to performance of their contracts, by rendering it difficult for them to secure employment elsewhere during the time for which they have engaged. It is made unlawful for a third person to interfere with, entice away, or induce a laborer or tenant to leave his employer or the leased premises before the expiration of his contract. But this is not all that the law declares. It is made equally unlawful to knowingly employ such laborer or tenant before the expiration of his contract, without the consent of his employer or landlord, not before the breach of his contract, as appellant contends the statute to mean, but before the expiration thereof."

The case at bar is differentiated from *Armistead* v. *Chatters, supra,* in a slight degree only. There the tenants were still on the plantation, and the defendant hired and moved them from the leased premises, while in this case the facts show that the tenants had left the premises with the fixed, definite purpose of never returning, except to obtain aid in moving their families and household belongings therefrom.

It is likewise true that this court had held a statute, which is in substance the same as this one, to be constitutional in the case of *State* v. *Hurdle,* 113 Miss. 736, 74 So. 681, which case went off on a demurrer charging the enticing away of a laborer from the premises; and the very serious question of whether or not a laborer abandoning his contract could be employed by any one during the life of the original contract of employment was not before the court.

To deny a laborer the right to abandon his contract (subject of civil liability) would seem to raise a very se-

rious constitutional question, if the statute be construed to mean as was announced in *Armistead* v. *Chatter case, supra.* It will be remembered that in that case Judge COOPER wrote the opinion, and it was handed down by this court on January 1, 1894. Thereafter the supreme court of the United States, by Mr. Justice HUGHES, on January 3, 1911, in *Bailey* v. *Alabama,* 219 U. S. 219, 31 S. Ct. 145, 55 L. Ed. 191, held the Alabama statute on a kindred subject unconstitutional. There it was sought to make it a crime for a laborer to break his contract and to fail to pay the debt accrued by virtue of the contract; and it was there held that it was the same as if the law had made it a criminal offense for a laborer to leave the services of his employer without just cause and without extinguishing his debt. It was also held that the statute violated the Thirteenth Amendment to the Constitution of the United States prohibiting slavery and involuntary servitude, and it was further held therein:

"The plain intention was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit which is the essence of involuntary servitude."

The construction of this statute, contained in the opinion of the court in the *Armistead* v. *Chatters case, supra,* would mean that, during the continuation of the contract of employment, the laborer would be compelled to render services, or, if he abandoned it, the hand of every man must be against him, and he cannot seek employment elsewhere without penalizing the party who employs him. In other words, by practical application, the mind of the laborer would not be free to breach his contract, as in all other lines of endeavor and commercial enterprises. He must "stay or starve," because no one could employ him until he had made investigation and found that such laborer or tenant had good cause to leave the leased

premises, because the employer or landlord had first breached the contract. Such a view cannot be upheld. We concede it to be our duty to uphold a statute, if possible, by placing a reasonable construction thereon which would render said statute harmonious with both the federal and state Constitutions.

It is significant that, while Judge COOPER still remained on the bench, in the case of *Jackson* v. *State* (Miss.), 16 So. 299, it was held that the mere employment of a servant after he had left his former master is not sufficient to sustain a conviction; and in *Beale* v. *Yazoo Yarn Mill,* 126 Miss. 807, 88 So. 415, Judge ETHRIDGE, speaking for this court, said:

"As pointed out above, the statute contemplates that the willful interference or the knowingly employing must be done with knowledge that a contract was in force at the time. If the defendant in good faith believed what Porter told him with reference to the discharge of members of his family, that is to say, if the plaintiff had breached the contract and he employed Porter under the belief that the contract was breached by the plaintiff, he would not come within the terms of the statute prohibiting such employment as the statute mentions. . . , We think the present case is distinguished from the Chatters case, in that the breach in the present case involved in the above instruction is a breach on the part of the plaintiff, and it is not a case of a contract being breached by Porter if the hypothesis embraced in this instruction be true."

And the same judge, speaking for this court in the case of *Shilling* v. *State,* 143 Miss. 709, 109 So. 737, said:

"We do not think the legislature intended to penalize a person for making a contract where he acts innocently. In our opinion, the inducement must be consciously made; that is, it must be with the knowledge of the existence of the preceding contract and before it is abandoned by the laborer. Under the Thirteenth Amendment, it is doubtful whether any statute can be enacted

which would have the effect of abridging or destroying the right of a person to abandon employment (subject to civil liability), as such would apparently constitute him an involuntary servant or engaged in servitude against his consent.''

So the latest announcement of this court is in line with what appears to be the view of the supreme court of the United States, that a laborer may breach his contract (subject only to civil liability), and one may thereafter deal with him as a free man.

We concur in the holding of the trial judge in the lower court, that Box acted in good faith in believing that the negroes had abandoned their contract, and abandoned the premises of their former employer, and, so believing, contracted with them, and in so doing did not render himself liable to any penalty imposed by this statute, which is extremely drastic and must be construed strictly in favor of liberty of action, liberty of contract, and liberty of person, consistent with the well-recognized rules of law governing same. And we also concur in the finding of the court that the statements and action of the negroes, and their refusal to return for the statements of account, constituted such abandonment of the former contract as authorized their re-employment by any other person.

Happily for us, as a state, we have long since passed the stage where there is any lingering desire in the minds of the masses of our people, as shown by our laws and reflected in our actions, to cling to slavery in any form, and no laborer may now have the brand of Cain upon him, so that he may not be free to seek employment under conditions which suit him, but is subject only to civil liability for breach of contract, as any other man would be.

In so far as the *Chatters case, supra,* and the other cases following it, all in conflict with the view here announced, to that extent, they are overruled.

The construction we have placed upon the statute leaves it upon our books, freed from constitutional objection, designed to prevent one from willfully, knowingly, enticing away and interfering with the servant of another.

*Affirmed.*

SMITH, C. J. (dissenting).

I am unable to concur in the affirmance of the judgment rendered in the court below, and am of the opinion that the court below erred in excluding appellant's evidence.

The statement of the case in the majority opinion is, in the main correct, and I have only two amendments to make thereto. First, it is reasonably clear from the evidence that the reason the appellant was unable to confer with Holston and Barton after he was notified by Rufus Box that he intended to move them from his premises was that Rufus prevented him from so doing. Second, the appellant and his plantation manager testified that no tenants or laborers on appellant's place had been mistreated in any way, and they were not aware of any dissatisfaction on the part of Holston and Barton with the manner in which they had been or would probably be treated by the appellant and his manager.

Holston and Barton were not employed by either the appellant or the appellee; consequently, the record presents no question of the appellee's having interfered with the performance of any contract of employment by them with the appellant, or of the appellee's having knowingly employed them while under a contract of employment with the appellant. Holston and Barton had rented land from the appellant, and afterwards Holston rented other land from the appellees and employed Barton to work for him on shares. The statute does not prohibit a tenant from renting land from a person other than his first landlord; and, if he should rent land from another,

such other incurs no liability to the tenant's prior land-lord unless he willfully interferes with the tenant's per-formance of his prior rent contract, or induces him to leave the leased premises. *Sneed* v. *Gilman* (Miss.), 44 So. 830. The provision of the statute, then, that is here involved, is that which prohibits interference with the performance by a tenant of his rent contract by inducing him either to break it or to leave the leased premises. The question then presented for decision is, Would the evidence have warranted the jury in believing that the ap-pellee willfully interfered with the performance of the rent contracts of Holston and Barton with the appellant, or that he induced them to leave the land that they had rented from the appellant? This question, I think, should be answered in the affirmative.

Holston and Barton had not left the land rented by them from the appellant when they offered to move on the appellee's land. Their families and household goods were still there and they had then done nothing that could be construed as a breach of their contracts with the appellant. Moreover, the excuse they gave the ap-pellee for their intention to leave the appellant's land, that they feared they would be mistreated in the future by the appellant's manager, is not shown to have any foundation in fact, and the mere anticipation by them of such mistreatment constituted no legal ground for the breaking by them of their contracts with the appellant. The appellee, knew when he agreed to rent land to Hol-ston and to aid him and Barton in moving thereon, that they would not carry out their contracts with the appel-lant. This fact was also known to Rufus Box, the appel-lee's plantation manager; and, if Rufus, for whose con-duct the appellee was responsible, prevented the appel-lant from interviewing Holston and Barton for the pur-pose of persuading them not to leave his land, the jury could very well have inferred therefrom, in connection with the other evidence that the appellee and Rufus Box, his manager, wilfully interfered with the performance

by Holston and Barton of their contracts with the appellant and induced them to leave the land they had rented from him. It may be, and the jury could have so found, that Holston and Barton would have remained on the appellant's land and carried out their contracts with him if the appellee had not listened to their complaints and aided and abetted them in their intention to break their contracts with the appellant.

The case of *Armistead* v. *Chatters* is not here in point, and no occasion arises for overruling it. That case involved not lease contracts, but contracts of employment; the distinction between which was pointed out in *Sneed* v. *Gilman, supra.*